IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 OCT 26 AM 9:23

U.S. DIST...
N.D. OF A...

| | |
|---|---|
| **RUSSELL LIPPERT,** | ] |
| **Plaintiff,** | ] |
| v. | ] CASE NO.: CV-03-HS-2741-NE |
| **COMMUNITY BANK, INC., et al.,** | ] |
| **Defendants.** | ] |

**ENTERED**

**OCT 2 6 2004**

## Memorandum Opinion

This is a civil action, filed on October 6, 2003, by the Plaintiff, Russell Lippert, against the Defendants Community Bank, Inc. and Community Bancshares. That Complaint alleged the Defendant's violated 12 U.S.C. § 1831j (Count I), Civil Conspiracy Under Alabama Law (Count II), and Pattern and Practice of Violation of 12 U.S.C. § 1831j (Count III). The Plaintiff filed an Amended Complaint on February 2, 2004, adding Pat Frawley as a Defendant under the same Counts. (doc. 7). Defendant Frawley was dismissed, with prejudice, on March 1, 2004, after Plaintiff failed to file a written response to that Defendant's Motion to Dismiss within 10 days as outlined in Judge Smith's Initial Order. (doc. 10).

Defendant Community Bancshares, Inc. filed a Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, on April 22, 2004. (doc. 17). That motion has been briefed and is still pending. No hearing date was set on that motion by the previous judge.

Defendant Community Bank filed a Motion for Summary Judgment on August 2, 2004. (doc. 36). Following this Court's procedure, that motion was set for hearing prior to being filed. Presently before the Court is that motion.

## I. UNDISPUTED FACTS

Community Bank's chairman and C.E.O., Patrick M. Frawley ("Frawley"), hired Russell Lippert ("Lippert") on April 14, 2003, as the bank's Senior Vice President and Director of Risk Management. The bank had recently installed Frawley as the head of a new senior management team that was working closely with state and federal regulators to restore the institution to solid regulatory and financial footing in the wake of several tumultuous years under the prior management. Lippert had previously worked as an independent consultant. Before that he had been a bank examiner with the Federal Deposit Insurance Corporation (the "FDIC") and the Alabama State Banking Department. Frawley hired Lippert based in part on Lippert's experience and his familiarity with the bank as the result of an earlier consulting contract.

Within a few days after Mr. Lippert started work, he sent a series of memoranda to the bank's local presidents requesting certain loan information. Less than three weeks later, on or about May 14, 2003, Lippert sent another series of memoranda to the bank's president and senior lender pertaining to loan "grades," or numerical ratings that reflect opinions of the quality of loans. Bank president Stacey W. Mann ("Mann") replied to Lippert's May 14 memoranda and objected to the loan-grading approach that Lippert had sought. On another occasion, Lippert sent detailed questionnaires to the local presidents seeking information that the local officers would not have had. Eventually, Frawley told Lippert that "we need to stop the memo writing campaign." Lippert has admitted that he had a strained relationship with, among others, Bank President Stacey Mann, Senior Lender Mark Soukup, and Director of Special Assets Ray Stone.

After being on the job for only one month, Lippert prepared a letter dated May 19, 2003, addressed to an employee of the Federal Deposit Insurance Corporation (the "FDIC") and an

employee of the Alabama State Banking Department (the "Banking Department"), in which he complained that the bank's management was resisting his recommendations. He did not allege any criminal wrongdoing or graft, but he criticized the bank's grading of delinquent loans and the level of the bank's loss reserve. The Plaintiff contends that in this letter he did alert the FDIC to possible violations of law or regulations and/or gross mismanagement.

Less than a week later, Lippert prepared a second letter addressed to the same individuals at the FDIC and the Banking Department, dated May 25, 2003, in which he again complained about what he saw as resistance by Bank management to his proposals for loan grading and loss reserves. The Plaintiff contends that this letter also contained other areas of concerns and raised such as actions that Lippert believed further demonstrated an intrusion on his independence. After May, Lippert did not send or receive correspondence to the FDIC or the Banking Department about alleged problems at the bank. Lippert met with an FDIC examiner during a June "visitation," and again on August 22 and/or 25 in preparation for an examination of the Bank, and during those meetings he allegedly discussed various concerns about the bank.

Lippert alleges that, on August 20, 2003, he told Bank Director and Audit Committee member Jimmie A. Trotter that he, Lippert, had communicated his concerns about the Bank to the FDIC. It is disputed as to whether Trotter mentioned this communication to other directors before the suit was commenced. Trotter had also contacted the FDIC about a matter unrelated to the issues that Lippert presented to the audit Committee, and he saw nothing wrong with a member of management such as Lippert providing information to the FDIC.

On or about August 20, 2003, Lippert showed up at Frawley's office with a six-page, single-spaced memorandum dated August 19 that outlined his various concerns about the bank, and which

3

Lippert and Frawley proceeded to discuss. At some point, Lippert created a new memo dated August 20, 2003. On August 21, 2003, Lippert left a copy of his August 20 memorandum at Frawley's office and, before Frawley had seen it, presented the same memorandum at a meeting of the Audit Committee that day. The plaintiff contends that this second memorandum was nearly identical to the first. Senior Lender Mark Soukup was not at the Audit Committee meeting on August 21.

Frawley and Mann were Bank directors but did not serve on the Audit Committee, and they were not present during the August 21 meeting at which Lippert presented his August 20 memorandum. After the meeting at which they heard Lippert's presentation, the four members of the Audit Committee met with Frawley and Mann and asked about issues that Lippert had addressed. Frawley and Mann discussed with the members of the Audit Committee the problems that had been encountered with Lippert's failure or refusal to communicate personally with other members of bank management, and his insistence on using memoranda as his primary means of communication. Frawley told the other directors on August 21 that while Lippert had identified some areas of concern that needed to be addressed by the Bank, Lippert had failed to work and communicate with other members of management to find solutions and corrections to the bank's problems. Including Frawley and Mann, six of the bank's eight directors were present during the discussion after the August 21 Audit Committee meeting. During the discussion, other directors who were present told Frawley that they would support whatever action he chose to take with regard to Lippert's continued employment.

At the time of the August 21 discussion, Frawley was considering terminating Lippert. The following day, Friday, August 22, 2003, Frawley gave notice of a special Board of Directors meeting to be held on Monday, August 25, 2003. Under the Board's operating rules, Frawley was required

4

to give at least a 24-hour notice of such a special meeting of the Board of Directors. On Monday, August 25, 2004, seven members of the Board of Directors unanimously approved a motion to give Frawley the authority to take whatever action he deemed appropriate with regard to Lippert's employment, including termination. The eighth director was consulted by Frawley after the meeting, and that director also agreed with the authority given to Frawley. Frawley eventually reached his final decision to terminate Lippert. On Tuesday, August 26, 2004, Frawley met with Lippert and informed him of his termination.

## II.     STANDARD OF REVIEW

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©. However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

## III.    DISCUSSION

### A.    The Whistleblower Claims

#### 1.    Applicable Law

The Complaint, as amended, contains three counts, each of which purports to assert a claim premised upon the federal "whistleblower" statute that applies to federally insured banks. *See* 12 U.S.C. § 1831j. The statute provides, in pertinent part:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request

5

of the employee) provided information to any Federal banking agency or to the Attorney General regarding -

>    (A) a possible violation of any law or regulation; or

>    (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;

by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j. The statute is part of the federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), as amended by the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA").

> The statute was initially silent concerning an applicable burden of proof. However, in December of 1993, Congress specifically incorporated the legal burdens of proof "that prevail under subchapter III of chapter 12 of Title 5" to govern adjudications of protected activities under § 1831(j). The referenced statute is the Whistleblower Protection Act's, 5 U.S.C. § 1221(e)(1) which provides in relevant:
>
>> Subject to the provisions of paragraph (2) [which prohibits this corrective action if the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure], in any case involving an alleged prohibited personnel practice ..., the Board shall order such corrective action ... if the employee, former employee or applicant for employment has demonstrated that a disclosure ... **was a contributing factor in the personnel action which was taken**....

*Primes v. Parish Nat. Bank*, 1995 WL 115750, *1 (E.D.La. 1995) (emphasis added). That section further states that:

> The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that--
>
> (A) the official taking the personnel action knew of the disclosure; and
>
> (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

5 U.S.C.A. § 1221(e)(1).

There is no Eleventh Circuit opinion on the meaning of "contributing factor", or otherwise dealing with this section of the code.[1] However, both parties cite *Rouse v. Farmers State Bank*, 866 F. Supp. 1191 (N.D. Iowa 1994), and other cases, for the proposition that to carry its burden, the Plaintiff must show "both knowledge of the defendant and temporal proximity." *Rouse*, 866 F. Supp. at 1209. For purposes of this memorandum opinion, the Court will accept the parties' position as to the applicable law in this matter.

Once the Plaintiff makes out a prima facie case of retaliation under § 1831j, if the Defendant can articulate a legitimate, non-discriminatory reason for his firing, that is not rebutted by the Plaintiff, Summary Judgment is appropriate. *Cosgrove v. Federal Home Loan Bank*, 1999 WL 163218 (S.D.N.Y. March 23, 1999); *Ellis v. NCNB Texas Nat'l Bank*, 842 F. Supp. 243 (N.D. Tex. 1994). However, prevailing case law supports the proposition that the Defendant's evidence must be clear and convincing. *Haley v. Fietchter*, 953 F. Supp. at 1094; *Frobose*, 152 F.3d at 612; *Rouse*, 866 F. Supp. at 1209.

### 2. Prima Facie Case (Knowledge of the Official)

The disclosures made by the plaintiff which are at issue in this case include two letters to the FDIC dated May 19, 2003, and May 27, 2003, informing the FDIC of: a) problems in the loan grading process and difficulties with management implementing a thorough review; b) that the loan

---

[1] The statute seems to say that different types of circumstantial evidence could be used to show that the disclosure was a contributing factor. The "such as evidence" language quoted above seems to imply that subsections "A" and "B" are only examples of types of circumstantial evidence that could be used–not a requirement that this be the only evidence used. In addition, a party could conceivable raise the issue as to whether, despite the presence of the word "and", subsections "A" and "B" must be read together, or operate exclusively of each other and are merely a non-exhaustive list of ways to prove whether something was a contributing factor.

7

and lease loss reserve ("ALLL") was underfunded by an additional $864,000 and aggregate ALLL was underfunded $1,600,000 as of April 30, 2003; c) that management had failed to take action on issues which effected loan grades, loss calculations, and other issues; d) that management was interfering with the independence of loan review; e) that he had presented the major points of his ALLL concerns to the Audit Committee and the Asset Quality Committee; and f) that he had been "disinvited" to the next board meeting. In addition, the Plaintiff transmitted to the FDIC an August 20, 2003, memo to Frawley from Lippert outlining several of his concerns about practices at the bank. Lippert also discussed this memo verbally with the FDIC. Lastly Lippert contends that he had various other verbal communications with the FDIC.

At oral argument, the Defendant conceded that, for purposes of this motion, it was not contested whether the disclosures made by Lippert directly to the FDIC are the types protected under the act. However, the Defendant does contest whether the same statements, made to the Board or to the Audit Committee, are protected. Also, the Defendant does not contest that the element of temporal proximity exists. Instead, the thrust of the focus of the Defendant's brief has been on the lack of knowledge of the disclosures on the official taking the personnel action.

        **a.**    **Both the Board and Frawley Are "the official taking the personnel action" In the Instant Case**

The statute says that the Plaintiff must show that "the official taking the personnel action knew of the disclosure." 5 U.S.C.A. § 1221(e)(1). The Defendant contends that the official is Frawley–the individual who actually performed the act of firing the Plaintiff. The Plaintiff states that the individual is either Frawley and/or the Board of Directors, because the Board gave Frawley the authority to fire Lippert.

The relevant statutes do not define the phrase "the official taking the personnel action." The

8

question then becomes, did the Board also take such action? There is no case law on whether the word "official" means the person who actually terminated the plaintiff or can mean a Board of Directors who gave another person the "authority" to terminate the plaintiff. However, other cases that have construed knowledge of "the official" have looked at all "pertinent" officials involved in the process. See, e.g. *Kress v. General Services Administration*, 13 Fed. Appx. 989, 2001 WL 735780 (Fed. Cir. 2001) (reviewing knowledge of all "pertinent agency officials" to determine whether action was proper).

While it is disputed as to whether the Board or Frawley made the decision to terminate the Plaintiff, it is undisputed that the Board gave Frawley the authority to take whatever action necessary to deal with the Plaintiff–including termination. This authority was specifically sought by Frawley. At the very least, then, Frawley was the Board's agent, acting on its behalf. In addition, William Caughran, the bank's general counsel and head of personnel, testified that the authority to terminate Mr. Lippert only exists in the Board of Directors, and not the Audit Committee or Frawley. *Caughran Deposition*, at 39-40. Based on this information, the Court determines that both Frawley and the Board were pertinent officials. Therefore the knowledge of both can be considered for purposes of summary judgment.

   b. **Knowledge of Frawley**

In his deposition, Frawley states unequivocally that he had no idea that Lippert was communicating with the FDIC. *Frawley I Deposition*, at 171-72, 245-46. He also states that he was not aware of anyone knowing that Mr. Lippert had done so. *Id.* He also states that the Board never discussed the issue before Lippert was terminated. *Id.*

In Lippert's deposition he states:

9

> Q. Do you have any evidence that they – that Mr. Frawley was told by anybody that you had made the report to the FDIC, or to the State?
>
> A. I have no written evidence.
>
> Q. You qualify it with written. Do you have any evidence, written, oral, anything?
>
> A. I've not – I haven't received written or oral communication that he was advised of that specifically, no.

*Lippert Deposition*, at 272. Accordingly, the Plaintiff can present no evidence of actual knowledge on the part of Frawley.

However, Lippert states that reports he made which contained protected disclosures, were made also to the Audit Committee and to the Board of Directors. He insists Frawley knew or should have known that these reports would be reviewed later by the FDIC. *Id.* at 274. Accordingly, the argument goes, Frawley "knew", for purposes of the act, that Lippert was in effect giving this information to the FDIC since that institution would review it eventually. In addition, Lippert argues that Frawley "knew", for purposes of the Act, because the same problems he brought up to the Board and Audit Committee were eventually brought to Frawley's attention by the FDIC.

> A petitioner may meet [his] burden by showing that the official taking the . . . action actually *or constructively knew* of the disclosure and acted within such a period of time that a reasonable person could conclude that the disclosure was a factor in the personnel action. *See Lewis v. Department of the Army,* 63 M.S.P.R. 119, 123 (1994), *aff'd,* 48 F.3d 1238 (Fed.Cir.), *cert. denied,* 116 S.Ct. 110 (1995); *Gergick v. General Services Administration,* 43 M.S.P.R. 651, 660-61 (1990).

*D'Elia v. Department of Treasury*, 73 F.3d 380, 1995 WL 734431, *1 (Fed.Cir. 1995); *See also, Rouse*, 866 F. Supp. at 1209. Generally "[t]he relevant inquiry for constructive knowledge is what the [party] should have known in the exercise of reasonable care." *Faragher v. City of Boca Raton,* 111 F.3d 1530, *1541 (11th Cir. 1997) (Title VII case – citing *Hirschfeld v. New Mexico Corrections*

*Dep't.,* 916 F.2d 572, 577 (10th Cir.1990)).

The evidence demonstrates that Frawley was Chairman of the Board of Directors and Chief Executive Officer of the Bank at all times relevant to this case. *Frawley I Deposition*, at 5. It is undisputed that he has several years experience in the banking industry and that he was hired as the head of a new senior management team that was working closely with state and federal regulators to restore the institution to solid regulatory and financial footing. Plaintiff's Consultant, Ronny G. Parham, in his affidavit, testified that

> Based on my experience, any Chief Executive Officer or senior banking manager, who has experience in the banking industry, should know that Federal and State examiners will be reviewing minutes and records of committees such as the Audit and Asset Quality Committees of Community Bank which had been under intense scrutiny by State and Federal regulators. In fact, examiner review of Board and Committee minutes are required by FDIC examination procedures, and information gleaned from these records is used in part to evaluate management of a financial institution.

*Parham Affidavit*, at 1-2.

It is undisputed that Frawley had seen the reports that were submitted and knew of their existence. The Defendant even agreed, at oral argument, that the information contained in the reports was the kind of information protected under the statute. Therefore, for purposes of the instant motion, resolving disputes in favor of the Plaintiff, the Court must determine that Mr. Frawley had at least constructive knowledge that reports made by the Plaintiff would eventually be seen by the FDIC.

The focus does not end there however. The question remains as to whether reports made by the Plaintiff to the Audit Committee or Board of Directors are *protected disclosures* under the act because they would eventually be seen by the FDIC. The court is persuaded by the sparse case law on this point that such communications, made in this manner, are not protected. The statute in

11

question in this case protects information provided to "any Federal banking agency or to the Attorney General." 12 U.S.C. § 1831j. It does not protect information provided to supervisors in the regular course of one's job, no matter whether and how that information would eventually arrive at the FDIC. As the Court in *Taylor v. Federal Deposit Ins. Corp.*, 132 F.3d 753, 763 (D.C. Cir. 1997), has stated:

> It seems reasonable that Congress would afford special protection for communications directed to the specified entities, all ones with a capacity to remedy wrongs brought to their attention, and would withhold the protection from communications that only drift into such hands by happenstance.

*Taylor*, 132 F.3d at 763. Reports made directly to the Board by Lippert did not give Frawley actual or constructive knowledge of protected disclosures made to the FDIC.

Next, the court must address whether Frawley had constructive knowledge of Lippert's communications with the FDIC because, as the plaintiff contends, Frawley "acknowledged that some of the issues Lippert raised [to the company] were also discussed by the FDIC examiners following their June and August-September visitations." *Plaintiff's Brief in Opposition to Summary Judgment*, at 6. However, the evidence cited by the Plaintiff regarding these discussions does not establish that they were discussions regarding issues that the FDIC would not have raised otherwise. *See Frawley I Deposition*, at 70, 169-171, 198, 201.

When asked specifically about these visits, the following exchange took place:

> Q. Was there any – during this period that we're describing from April 14th to August 26th, did the FDIC relay to you any of these same concerns or the substance of the information that Mr. Lippert had reported to them?
>
> A. I'll just simply say that the topic of the loan loss reserve and the topic of management initiatives towards improving asset quality were discussed during their visitation.
>
> Q. Okay. And you were aware these were some of the same items that Mr.

12

|  | Lippert, some of the same issues Mr. Lippert was raising at the bank, correct? |
|---|---|
| A. | The subject matter was the same. |
| Q. | Okay. |
| A. | In other words, the subject matter, credit administration practices is a focal point of their review, and it was as it normally would be. |

*Frawley 1 Deposition*, at 169-171. The evidence of these comments do not establish actual or constructive knowledge.

There is no evidence that Frawley had either actual or constructive knowledge of protected disclosures made to the FDIC.

### b. Knowledge of the Board

The parties agree that as to at least one member of the Board, Jimmie Trotter, there is a genuine issue of material fact regarding his knowledge. Accordingly, the Court must assume that Mr. Trotter had actual knowledge of the Plaintiff's contacts with the FDIC at the time the Board met and gave Frawley the authority to terminate the Plaintiff. There is ample uncontradicted evidence in the file, in the form of affidavits and deposition testimony, demonstrating that no other Board members knew of either Mr. Lippert's communications with the FDIC, or Mr. Lippert's conversation with Mr. Trotter. Accordingly, the issue becomes: to what extent does the knowledge of one board member establish knowledge on the part of the Board?

There are no cases cited by the Plaintiff on this issue. The Defendant directs the Court to several non-whistleblower cases in the Eleventh Circuit.

In *Matthews v. Columbia County*, 294 F.3d 1294 (11th Cir. 2002), a former county employee brought a § 1983 action against the county, alleging that her termination was in retaliation for exercise of her free speech rights. The District Court entered judgment on a jury verdict for plaintiff and an appeal was taken. The Court of Appeals held that the county could not be held liable when

13

only one of the three-member majority of county commissioners who voted to eliminate plaintiff's job had unconstitutional motive. Similarly, in *Mason v. Village of El Portal,* 240 F.3d 1337 (11th Cir. 2001), the Court dealt with a white male police chief who brought a § 1983 action against a village alleging racial discrimination and free speech retaliation in connection with the village council's vote not to reappoint him and asserted a conspiracy claim against the individual council members. The District Court granted summary judgment for defendants and the police chief appealed. The Court of Appeals held that an alleged racially discriminatory motive of only one member of a three-member majority could not give rise to § 1983 municipal liability. In that case, the Court held that *all three* members of the council had to share the illegal motive.

In *Dixon v. Burke County, Georgia,* 303 F.3d 1271 (11th Cir. 2002), an unsuccessful female candidate for a county board of education vacancy brought a § 1983 sex discrimination/equal protection action against the county, the district attorney, and the foreman of a grand jury that had been charged with providing recommendations for filling a vacancy. The District Court granted summary judgment for defendants, and the candidate appealed. The Court of Appeals held that the county could not be liable based on the bias of one jury member. *See also, Horne v. Russell County Com'n,* 295 F.Supp.2d 1289 (M.D.Ala.,2003) (alleged gender bias of two members of four-person county commission majority was not sufficient to establish municipal liability under § 1983).

Based on the decisions in these cases and on their rationales, the Court concludes that the Eleventh Circuit would apply these same standards to determine whether the entire board had knowledge in a whistleblower case. Accordingly, because the undisputed evidence establishes that only one board member, at best, could have had knowledge, knowledge cannot be imputed to the entire board. Since the board did not have knowledge of the alleged whistleblowing, it cannot be

said that the protected conduct was a contributing factor in the board's decision. Accordingly, summary judgment in the whistleblower claims is due to be **GRANTED**.

**B.     There is No Civil Conspiracy claim.**

This claim is alleged between the two defendants–a corporation and its subsidiary. This is not allowed under the law. *Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). The Motion for Summary Judgment as to the Civil Conspiracy Claim will be **GRANTED**. A separate Order will be entered.

**C.     Pattern and Practice**

Plaintiff says, without admitting, that there may not be a separate claim for "pattern and practice", but that it pled it as such to alert defendants to its intent to put on such evidence and make such claims for purposes of punitive damages. As there is no separate claim for pattern and practice, the Motion for Summary Judgment on the Pattern and Practice claim will be **GRANTED**. However, this will not effect the ability of the Plaintiff to present pattern and practice evidence at trial, unless the Court grants an appropriate Motion in Limine precluding such evidence.

A separate Order will be entered.

Done this __25__ day of October, 2004.

VIRGINIA EMERSON HOPKINS
UNITED STATES DISTRICT JUDGE

15